UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID. M. LINDAMOOD,

    Plaintiff,

    v.

JO ANNE BARNHART, Commissioner,
Social Security Administration,

    Defendant.

Civil Action No. 04-105 (CKK)

**MEMORANDUM OPINION**
(February 19, 2007)

Plaintiff David M. Lindamood brings this action seeking review and reversal of

Defendant's final administrative decision denying his claim for Disability Insurance Benefits

("DIB") pursuant to 42 U.S.C. § 405(g).  Plaintiff seeks in the alternative an order remanding his

case to the Social Security Administration for a new administrative hearing.  Pending before the

Court are Plaintiff's [8] Motion for Judgment of Reversal and Defendant's [10] Motion for

Judgment of Affirmance.  After reviewing the Parties' briefs, the administrative record, and the

relevant case law, the Court shall DENY Plaintiff's [8] Motion for Judgment of Reversal and

GRANT Defendant's [10] Motion for Judgment of Affirmance.

**I.  BACKGROUND**

Plaintiff David M. Lindamood was born in 1947 and currently resides in Honduras,

Central America.[1] Administrative Record ("A.R.") at 14, 255.  He stopped working as an electric

---

[1] Plaintiff neither resides nor maintains a principal place of business in the United States.
Accordingly, the Social Security Act requires Plaintiff to bring his action for DIB in the United
States District Court for the District of Columbia.  *See* 42 U.S.C. § 405(g) ("Such action shall be
brought . . . if he does not reside or have his principal place of business within any such judicial

substation foreman in September 1999, when pain in his right knee matured into degenerative

joint disease. *Id.* at 66, 81. He underwent total knee replacement surgery on his right knee on

September 3, 1999. *Id.* at 196-98. Plaintiff filed for Disability Insurance Benefits on April 5,

2000. *Id*. at 80-89. Plaintiff's application cites his "Rt Knee" as the "illnes[s], injur[y], or

conditio[n] that limit[s] [his] ability to work." *Id.* at 81. The application was denied both

initially and upon reconsideration, and Plaintiff timely requested a hearing before an

Administrative Law Judge (ALJ). *Id.* at 14. On April 7, 2003, the ALJ denied Plaintiff's claim.

*Id.* at 22. Plaintiff timely requested that the Appeals Council review that decision; on August 4,

2003, finding no basis for granting the request for review, the Appeals Council upheld the

decision of the ALJ. *Id.* at 5. Having exhausted his administrative remedies, Plaintiff brings the

pending action seeking judicial review by this Court. Pl.'s Mem. for J. of Reversal at 3.

Prior to undergoing total knee replacement surgery, Plaintiff worked as an electrical

substation foreman, a substation metering technician, and a substation wireman. A.R. at 82, 90.

Dr. Craig G. Mohler, M.D., performed a "[c]emented total right knee replacement" on Plaintiff

on September 3, 1999. *Id.* at 196. On September 15, 1999, Dr. Mohler reported that Plaintiff

was "doing well" and "gradually decreasing the amount of medicine he needs for pain relief." *Id.*

at 173. Dr. Mohler reported on Plaintiff's progress after appointments on October 13, 1999 and

December 1, 1999. *Id.* at 169, 172. Dr. Mohler wrote a letter to the Human Resources

Coordinator at the Springfield Utility Board (Plaintiff's former place of employment) on January

3, 2000, indicating that he "[did] not feel Mr. Lindamood is at this time ready to return to his job

_____

district, in the United States District Court for the District of Columbia "). *See also dkt. entry* [1]
at 7.

2

with the Springfield Utility Board," further stating that "[i]f Mr. Lindamood is going to return to his regular job without restrictions then he should not return for another three months. When he does go back to work, there will definitely be some permanent restrictions, including no lifting greater than 50 pounds, no jumping, running or repeated stair/ladder climbing and no kneeling or crawling." *Id.* at 166. After examining Plaintiff on February 29, 2000, Dr. Mohler indicated that "[e]xamination shows the patient's right knee wound is well healed. There is no effusion. Range of motion shows full extension to 135 degrees." *Id.* at 160. Radiographs showed "a well-aligned cemented total knee replacement without evidence of loosening." *Id.* Dr. Mohler further indicated that Plaintiff was "not going to be able to return to his former job as an electrical foreman." *Id.* Also on February 29, 2000, Dr. Mohler wrote a letter to Plaintiff's wife, indicating that in his medical opinion, "Mr. Lindamood is totally disabled from his job as an electrical foreman with Springfield Utility Board. He is not able to stand for more than an hour at a time. He cannot lift more than twenty pounds. He will never be able to return to this type of work because his knee replacement will simply not allow the physical demands of the job." *Id.* at 159.

On July 29, 2000, Plaintiff was examined by Dr. Andrius Skucas, M.D., complaining of pain in his right knee. A.R. at 142. Dr. Skucas observed that Plaintiff "was able to walk over and sit on the examination table without difficulty." *Id.* at 143. Dr. Skucas noted that Plaintiff exhibited a full range of motion, no atrophy or contractures, and mostly normal ambulation." *Id.*

On August 9, 2000, Dr. Charles Spray, M.D., performed a Residual Physical Functional Capacity Assessment of Plaintiff. Dr. Spray indicated that Plaintiff could occassionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit

(with normal breaks) for a total of about 6 hours in an 8-hour workday, and engage in unlimited pushing and or pulling.  *Id.* at 145-46.  Furthermore, Dr. Spray assessed that Plaintiff could occasionally climb both ramp/stairs and ladder/rope/scaffolds, kneel, crouch, and crawl; and frequently balance and stoop.  *Id.* at 146.  Dr. Spray reported no manipulative or visual limitations for Plaintiff.  *Id.*  Dr. Mohler later indicated on January 29, 2003, that he disagreed with Dr. Spray's assessment, stating that Plaintiff "is unable at this time to return to his previous job as an electrician," and could not work in a job "where he has to stand a total of six hours per day after total knee replacement."  *Id.* at 262.

On February 21, 2001, Dr. Mohler examined Plaintiff, noting that "[t]he knee extends full with flexion to 140 degrees."  *Id*. at 154.  Dr. Mohler indicated to Plaintiff that "[h]e should be employed at a sedentary job only without lifting or operating heavy machinery."  *Id.*  However, on March 6, 2001, Dr. Mohler wrote a letter to Ms. Julie Zongker, Disability Claims Representative for Jefferson Pilot Financial, stating that Plaintiff "continues to be completely and totally disabled from working full-time or part-time as an Electric Foreman.  His knee replacement prevents him from working at this job.  I see no prognosis for returning to gainful employment on a full or part-time basis.  He should be considered 100 percent disabled."  *Id.* at 153.  Finally, after examining Plaintiff on September 26, 2001, Dr. Mohler indicated that Plaintiff "is not able to work at his usual job as an electrician for the Springfield Utility Board nor will he ever be able to do this type of work.  His is to be considered totally disabled from any work of this type."  *Id*. at 152.

On January 7, 2002, Dr. Mohler conducted a Physical Capacities Evaluation of Plaintiff, in which he assessed that Plaintiff could only sit for 2 hours and stand for 1 hour in an 8-hour

4

workday. *Id.* at 252. Dr. Mohler assessed that Plaintiff could occasionally lift or carry up to 19

pounds, rarely lift between 20 and 49 pounds, and never lift 50 pounds or more. *Id.* at 252-53.

He further assessed that Plaintiff would never be able to bend, squat, crawl, climb, and only

occasionally reach above shoulder level. *Id.* at 253. Dr. Mohler assessed that Plaintiff's pain had

a "moderate" effect on Plaintiff's ability to function. *Id.*

At the hearing held before the ALJ on January 23, 2003 (at which Plaintiff waived his

right to personally appear but at which Abdul Raheem Mathon of Advantage Consultants 2000

appeared on his behalf), the ALJ heard testimony from both a Medical Expert ("ME"),

orthopedist Dr. Rafael J. Fernandez, and a Vocational Expert ("VE"), Gary R. Fannin, M.S. A.R.

at 265-98.

The ME, after examining Plaintiff's medical records, testified that Plaintiff did not meet

or equal any impairment listed at 20 C.F.R. 404. *Id.* at 273. The ME assessed the Residual

Physical Functional Capacity Assessment of Plaintiff performed on August 9, 2000 by Dr. Spray

as well as the Physical Capacities Evaluation conducted by Dr. Mohler on January 7, 2002,

opining that with respect to Dr. Mohler's more restrictive report, there were "not really" medical

signs, findings, or laboratory techniques that would support Dr. Mohler's conclusions, citing

Plaintiff's "excellent" range of motion, no signs of weakness supported by radiographic

evidence, and that Plaintiff was simply not "significantly limited in his evaluation." *Id.* at 275-

77. The ME specifically stated that over the course of an 8-hour day, "I think that the sitting two

hours and the standing one hour on a continual basis would be the limitation that I would

support." *Id.* at 278. The ME further opined that Plaintiff could occasionally lift 20 pounds and

frequently lift 20 pounds; never climb ladders, ropes, or scaffolds; occasionally climb stairs,

crouch, or stoop; and never kneel or crawl.  *Id.* at 282-84.  Further, the ME stated that it would be

reasonable for Plaintiff to use a cane or walking stick for prolonged standing.  *Id.* at 286.  The

ME further opined that Plaintiff's significant weight (Plaintiff is described on A.R. 280 as 6'5"

and 280 pounds, though it is clear from the record that Plaintiff's weight was subject to

fluctuation) would have an affect on the longevity of his total knee replacement.  *Id.* at 288.

However, after the hearing, Dr. Mohler himself clarified that Plaintiff "did not need a cane to

ambulate." A.R. at 18, 262.

     The VE testified that Plaintiff's prior position as an electrical utilities foreman was a

skilled position with an SVP of 7 and was classified by the DOT as a medium capacity position.

A.R. at 271.  The VE opined that Plaintiff possessed the following transferrable skills:

examining, testing, repairing, installing electrical equipment, knowledge of electrical systems

(particularly knowledge of electrical power substation systems), the ability to read blue prints,

supervisory skills, and special knowledge in tools and equipment used in doing maintenance and

repair work.  *Id.* at 272.  The VE opined that such skills would be transferable to light jobs in

repairing electrical equipment, such as bench work electronics, electrical equipment repair, and

office electrician.  *Id.*  The VE agreed that Plaintiff could not perform his prior job.  *Id.* at 289-

90.  The ALJ posed the following hypothetical to the VE in two ways–both assuming that

Plaintiff needed or did not need a cane for ambulation:

>     If he had the limitations that the doctor described–that is our doctor, Dr.
> Fernandez described in his testimony essentially light work with some other restrictions,
> an alternate sit/stand requirement and the limitations on climbing other than stairs and
> kneeling, et cetera, the ones that–and crawling and the environmental restrictions he
> outlined, would he be able to do these jobs?  Have transferrable skills to the jobs you've
> been referring to?

A.R. at 290.  The VE indicated that Plaintiff could perform jobs in shop repair, doing actual repair or supervisory work, that constituted light jobs ("basically bench jobs") where "he could have the option of sitting or standing and walking around if he needed" and for which he would not need additional training.  *Id.*  A combination of such jobs–specifically supervisor of a meter repair shop, transformer shop supervisor, relay shop supervisor, transformer assembly supervisor–account for 10,000 to 15,000 jobs in the United States, 1,500 jobs in the state of Florida, and 300 to 400 in the regional area.  *Id.* at 291.  The number of skilled but non-supervisory jobs to which Plaintiff's skills would be transferrable–such as electric meter repairer, inside meter tester, relay tester, and electrical instrument repairer, constitute between 20,000 and 22,000 in the United States, 2,000 to 3,000 in Florida, and about 1,000 in the region.  *Id.* at 292.  The VE clarified that such listed jobs were merely exemplary, not exhaustive.  *Id.*  The ALJ clarified that no special rulings would be applied because of Plaintiff's age in light of his falling into the category of "light" work.  *Id.* at 293.

In a decision dated April 7, 2003, the ALJ denied Plaintiff's requested benefits.  *Id.* at 14-23.  The ALJ found that Plaintiff met the nondisability requirements of Section 216(I) of the Act and was insured through the date of the decision.  *Id.* at 15.  The ALJ then properly evaluated Plaintiff's disabilities using the required five-step process.  *See* 20 C.F.R. § 404.1520(a)(4) (listing five-step sequential evaluation process).  *Id.*  At Step One, the ALJ noted that Plaintiff had not engaged in significant gainful activity at any time pertinent to his decision.  *Id.*  At Step Two, he determined that the medical evidence established that Plaintiff suffers from a "severe" impairment in the form of "degenerative changes of the right knee following a total knee replacement."  *Id.*  At Step Three, the ALJ determined that Plaintiff's condition did not meet or

7

medically equal any of the Listings of Impairments at Appendix 1, Subpart P, No. 4 (20 C.F.R §

404.1520(d)).  *Id.*

At Step Four, the ALJ found that Plaintiff was no longer able to perform his past relevant

work.  *Id.* at 21.  At Step Five, the ALJ determined that based "[o]n the foregoing evidence, I

conclude that at all times after January 2000, the claimant retained the functional capacity to

perform a *limited range* of light physical exertion.  He was able to lift and carry up to 20 pounds

occasionally, lift and carry 10 pounds frequently, could stand or walk for two hours in an 8-hour

day, and could sit for approximately 6 hours per day."  *Id.* at 18 (emphasis added).  Finding the

VE's testimony credible as to the availability of jobs that fit within the above limitations in the

economy, the ALJ concluded that "[the claimant] retains the functional capacity to perform a

limited range of light physical exertion, and he can perform jobs that exist in significant numbers

in the national economy.  Under theses circumstances, he cannot be found to be 'disabled' within

the framework of medical/vocational rules 201.15 and 202.15 prior to attainment of age 55, and

rules 201.07 and 202.07 thereafter."  *Id.* at 21.

## II.  LEGAL STANDARD

"In a disability proceeding, the ALJ 'has the power and the duty to investigate fully all

matters in issue, and to develop the comprehensive record required for a fair determination of

disability.'"  *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of

HEW*, 627 F.2d 278, 281 (D.C. Cir. 1980)).  The Social Security Act defines "disability" as an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

8

423(d)(1)(A) (2004). Inability to engage in substantial gainful activity not only includes the individual's inability to do his previous work, but requires as well an inability, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* at § 423(d)(2)(A). In making this determination, the ALJ is to consider (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) the plaintiff's age, education, and work history; however, "[t]he expert opinions of a treating physician are binding on the fact finder unless contradicted by substantial evidence to the contrary." *Davis v. Heckler*, 566 F. Supp. 1193, 1196 (D.D.C. 1983) (citing cases).

A court will not disturb the determination of the Commissioner if it is based on substantial evidence in the record and the correct application of the relevant legal standards. 42 U.S.C. § 405(g), 1383©; *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). While a scintilla of evidentiary support is insufficient, the test can be satisfied by "something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir. 2003). In reviewing an administrative decision, a court may not determine the weight of the evidence, nor substitute its judgment for that of the Secretary if her decision is based on substantial evidence. *Butler*, 353 F.3d at 999; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Instead, the reviewing court must carefully scrutinize the entire record to determine whether the Secretary, acting through the ALJ, has analyzed all the evidence and has sufficiently

explained the weight she has given to obviously probative material. *Id.* "Because the broad purposes of the Social Security Act require a liberal construction in favor of disability, the court must view the evidence in the light most favorable to the claimant." *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000) (citing *Davis v. Shalala*, 862 F. Supp. 1, 4 (D.D.C. 1994)).

The reviewing court must also determine whether credible evidence was properly considered. *Id.* (citing *Dionne v. Heckler*, 585 F. Supp. 1055 (D. Me. 1984)). The ALJ's final decision must contain "a statement of findings and conclusions, and the reasons or the basis therefor, on all material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557©. Importantly, an ALJ cannot merely disregard evidence which does not support his conclusion. *Dionne*, 585 F. Supp. at 1060. A reviewing court should not be left guessing as to how the ALJ evaluated probative material, and it is reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence. *Martin*, 118 F. Supp. 2d at 13 (citing *Davis*, 862 F. Supp. at 2).

### III. DISCUSSION

Plaintiff argues that the ALJ erred by 1) posing a hypothetical question for the VE's analysis that inaccurately reflected the ALJ's RFC assessment; 2) incorrectly addressing the transferability of Plaintiff's skills, 3) failing to explicitly inquire of the VE regarding potential conflicts with The Dictionary of Occupational Titles ("DOT"); 4) improperly making a determination of Plaintiff's RFC due to lack of a "function by function" assessment of Plaintiff's ability to perform the exertional and non-exertional requirements of light work; and 5) erroneously evaluating Plaintiff's subjective complaints. Pl.'s Mem. for J. of Reversal at 4-16.

To qualify for Social Security Disability Insurance Benefits, Plaintiff must demonstrate

that he cannot engage in "substantial gainful activity by reason of any medically determinable physical . . . impairment," and that such physical impairment(s) prevent him from engaging in his previous work, or any other kind of "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(1)-(2); *id.* § 1382c(a)(3). By satisfying both conditions, a claimant is "disabled" for purposes of the Social Security Act.

To decide whether a claimant has proven he is disabled, the ALJ must use a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920. The steps require a determination of (1) current work activity; (2) severity of the impairments; (3) whether the impairment meets or equals a listed impairment; (4) if the impairment prevents claimant from doing past work; (5) if the impairment prevents him from doing other work upon consideration of the residual functional capacity. *Id.* Once a claimant demonstrates that he is unable to perform past relevant work, the burden shifts to the Commissioner to show that job opportunities exist for one demonstrating the claimed impairments. *Brown v. Bowen*, 794 F.2d 703, 706 (D.C. Cir. 1986) (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)). Each step requires a detailed inquiry into the evidence presented, based on additional regulations as well as Social Security Rulings ("SSR"). The Court will identify the relevant inquiry in a manner which mirrors the way Plaintiff sets out his motion for judgment of reversal, rather than evaluate each of these detailed requirements.

A. *Improper Hypothetical Question*

The Commissioner bears the burden under Step Five of the disability analysis to show that there are other jobs available in the national economy that can be performed by an individual with the claimant's impairments. *Brown v. Bowen*, 794 F.2d 703, 706 (D.C. Cir. 1986) (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)). In this case, the ALJ did so in part by relying on the

11

testimony of the VE, which the ALJ credited as credible.  A.R. at 20.  Plaintiff now disputes the

substance of the hypothetical question posed by the ALJ.  Pl.'s Mem. for J. of Rev. at 4-14.

Plaintiff alleges that while the ALJ found in his decision that Plaintiff "could stand or

walk for two hours in an 8-hour day, and could sit for approximately 6 hours per day," A.R. at

18, the hypothetical question posed to the VE implied that Plaintiff was able to stand or walk for

6 hours of an 8 hour day.  *See* Pl.'s Mem. for J. of Reversal at 4-6.  Specifically, Plaintiff alleges

that "the limitations that [the ME] described" as referenced in the ALJ's hypothetical

incorporated the ME's alleged testimony "that the Plaintiff would be able to stand and walk for

six hours in an eight-hour day, with no more than one hour standing at a time."  *Id.*

While the hearing transcript could be more clear on the matter,[2] the only truly definitive

statement provided by the ME with respect to his recommended sit/stand option for Plaintiff is as

follows:   "I think that the sitting two hours and the standing one hour on a continual basis would

be the limitation that I would support."  A.R.  at 278.  Particularly since the ALJ's question

referenced "the limitations that the doctor described–that is our doctor, Dr. Fernandez described

in his testimony," and the ME explicitly stated the limitation he would support to be two hours

sitting followed by one hour standing (which would equal a total of six hours sitting, two hours

standing over the course of an 8-hour day), the Court finds that the ALJ's hypothetical question

incorporated the ALJ's written assessment that Plaintiff "could stand or walk for two hours in an

8-hour day, and could sit for approximately six hour per day."  *Id.* at 18.  Furthermore, it is clear

---

[2]  At one point, the ALJ states: "What the doctor has indicated as I understood him was that when he has to take a break after he's been standing an hour, he can sit for five or ten minutes, he can then get up again."  However, this statement does not seem intended to sum up the sit/stand option intended for Plaintiff, as nowhere is it alleged or stated that Plaintiff can stand continuously simply taking breaks on the hour.

for the VE's response that the VE did not interpret the ALJ's hypothetical question to posit requiring the Plaintiff to stand for 6 hours during an 8-hour day, as the VE discusses jobs to which he deems Plaintiff's skills transferrable as "basically bench jobs" where Plaintiff "could have the option of sitting or standing and walking around if he needed."  A.R. at 290. Accordingly, the Court does not find that the ALJ posed an improper or inaccurate hypothetical question to the VE.

B.     *Transferability of Plaintiff's Skills*

Plaintiff argues that the ALJ erroneously assessed the transferability of Plaintiff's skills because he 1) applied the wrong standard to his assessment, and 2) failed to include sufficient analysis to substantiate his conclusions.  Pl.'s Mem. for J. of Reversal at 6-9.

Pursuant to 20 C.F.R. § 404.1568(d)(4):

> Transferability of skills for individuals of advanced age. If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s). We will decide if you have transferable skills as follows. If you are of advanced age and you have a severe impairment(s) that limits you to no more than sedentary work, we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry. (See § 404.1567(a) and § 201.00(f) of appendix 2.) If you are of advanced age but have not attained age 60, and you have a severe impairment(s) that limits you to no more than light work, we will apply the rules in paragraphs (d)(1) through (d)(3) of this section to decide if you have skills that are transferable to skilled or semiskilled light work (see § 404.1567(b)). If you are closely approaching retirement age (age 60-64) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry. (See § 404.1567(b) and Rule 202.00(f) of appendix 2 to this subpart.)

20 C.F.R. § 404.1568(d)(4).  Plaintiff's age ranged from 52 to 55 years from Plaintiff's alleged

onset date through the date of the ALJ's decision.  Pl.'s Mem. for J. of Reversal at 7.  The ALJ's

decision stated that "[t]he claimant has skilled work experience and has acquired skills which

may be used in performing jobs within his residual functional capacity with little, if any,

vocational adjustment."  However, a careful reading of this language in the ALJ's decision

reveals that while similar, this language does not exactly mimic the language of the

transferability of skills standard applied to individuals with severe impairments limiting them to

no more than light work (which describes Plaintiff) that are aged 60-64 (which did not describe

Plaintiff), as the ALJ used the term "little" rather than "very little" in assessing the degree of

vocational adjustment applied to jobs that Plaintiff could perform.  Moreover, during the

administrative hearing, the ALJ sought and received clarification from the VE that the special

consideration for those over 55 years old need not be given in this case.  *See* A.R. at 293.

*Compare* 20 C.F.R. 404.1568(d)(4) *with* 20 C.F.R. 404.1568(d)(1), (2), and (3).  In any case,

even assuming *arguendo* that the ALJ had applied the standard for individuals "closely

approaching retirement age" as Plaintiff alleges, the Court fails to understand how the application

of this more rigorous transferability standard could possibly have prejudiced Plaintiff (if

anything, it would decrease rather than increase the number of jobs for which Plaintiff would be

deemed to have transferrable skills).

Second, Plaintiff argues that "the [ALJ's] transferability of skills analysis is nothing more

than a naked conclusion, devoid of analysis."  Pl.'s Mot. for J. of Reversal at 8.  However, it is

clear from the ALJ's decision that he relied on the testimony of the VE, which he found to be

credible, "because it was based on an in-depth knowledge of the Dictionary of Occupation Titles

14

and other studies and publications, as well as his personal knowledge of the national and local job market . . . ." A.R. at 20. The ALJ cited in his opinion the VE's testimony regarding Plaintiff's various skills and the jobs to which such skills could be transferred with "little" adjustment subject to the limitations set forth in the hypothetical posed by the ALJ. *See* A.R. at 20. *See also supra* 6-7. During the hearing, the ALJ in fact asked the VE "[i]f he had the limitations that the doctor described . . . would he be able to do these jobs? Have transferable skills to the jobs you've been referring to?" A.R. 290. The VE responded in the affirmative, concluding that Plaintiff's skills of examining, repairing, testing and installing electrical equipment combined with his knowledge of electrical systems could be transferred to the positions identified. *Id.* at 272. The ALJ agreed, finding the VE's testimony credible and accurately reflective of Plaintiff's residual functional capacity. *Id*. at 20. In sum, the Court finds that the ALJ's determination with respect to the transferability of Plaintiff's skills rested on substantial evidence and was sufficiently detailed to allow for judicial review.

> C.     *The Dictionary of Occupational Titles ("DOT")*

The Commissioner bears the burden under Step Five of the disability analysis to show that there are other job opportunities available to an individual with impairments such as those plaguing the claimant. *Brown v. Bowen*, 794 F.2d 703, 706 (D.C. Cir. 1986) (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)). In determining whether the Commissioner has met this burden, the ALJ may rely on both the DOT and the testimony of a VE. *Brown v. Barnhart*, 408 F. Supp. 2d 28, 32 (D.D.C. 2006). However, where an "apparent unresolved conflict between VE . . . evidence and the DOT" arises, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence." SSR 00-4P, *Use of Vocational Expert and Vocational*

*Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, 2000 WL 1898704, *2 (S.S.A. Dec. 4, 2000).

Plaintiff's Motion for Judgment of Reversal cites case law from other jurisdictions suggesting that an ALJ is required to specifically ask a VE about the possibility of conflicts between VE evidence and the DOT.  Pl.'s Mem. for J. of Reversal at 9-11.  However, persuasive authority in this jurisdiction indicates that "'the mere failure to ask such a question cannot by itself require a remand.'" *Brown v. Barnhart*, 408 F. Supp. 2d at 35 (quoting *Hodgson v. Barnhart*, 2004 WL 1529264, at *2 (D. Me. 2004) and noting that "[s]uch an automatic right on a purely technical ground where there is otherwise substantial evidence to support the SSA's findings of fact would be contrary to the deference due the SSA"); *see also Boone v. Barnhart*, 353 F.3d 203, 206 (3d Cir. 2003) (same) (refusing to adopt a "general rule that an unexplained conflict between a vocational expert's testimony and the DOT necessarily requires reversal"). The ALJ's failure to specifically inquire into the possibility of inconsistency between VE testimony and the DOT is insufficient on its own to merit a remand.  *Brown v. Barnhart*, 408 F. Supp. 2d at 35.

In the instant matter, Plaintiff does not cite to *any* conflict between the evidence provided by the VE and the DOT.  *See* Pl.'s Mem. for J. of Reversal at 9-10.  In fact, the VE, over the course of his testimony, cited to the positions that existed in the national economy that could be performed by an individual with Plaintiff's limitations requiring light physical exertion by DOT number.  *See* A.R. at 20, 291, 292.  In Plaintiff's opposition to Defendant's Motion for Judgment of Affirmance, Plaintiff "identifies" an alleged conflict in stating that the VE intended to identify occupations that can be performed by one who is limited to standing and walking two hours in an

16

8-hour day, but that the DOT's definition of "light exertional activity" requires more mobility

than simply standing and walking two hours in an 8-hour day.  Pl.'s Opp'n to Def.'s Mot. for J.

of Affirm at 4-5.

Pursuant to the DOT,

The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs.  *A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work*; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances).  Relatively few unskilled light jobs are performed in a seated position.  "Frequent" means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time.  The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping.  Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.  They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83-10, 1983 WL 31251 at *5-6 (emphasis added).  In his Opposition, Plaintiff apparently

ignores the phrase "[a] job is also in this category when it involves sitting most of the time but

with some pushing and pulling of arm, hand or leg or foot controls, which require greater

exertion than in sedentary work."  *See also* 20 C.F.R. § 404.1567(b).[3]  The Court does not find

---

[3]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity

any conflict between the testimony of the VE and the DOT, and as such, the ALJ's lack of inquiry regarding any conflict was not improper.

### D.    The Residual Functional Capacity ("RFC") Analysis

To make a determination under steps Four and Five of the disability analysis, which involve an inquiry into the claimant's ability to return to past work and a determination of whether future employment of any variety is possible, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ must engage in a residual functional capacity ("RFC") analysis. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184 at *2 (S.S.A. July 2, 1996). An RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical or mental activities." SSR 96-8p, 1996 WL 374184 at *2. The ALJ must explain how he considered and resolved ambiguities in the record with regard to the ultimate RFC decision. *Butler*, 353 F.3d at 1000.

Plaintiff raises two main arguments challenging the ALJ's RFC analysis. Pl.'s Mem. for J. of Reversal at 10-14. He argues that the ALJ was required to, but did not, perform a function-by-function assessment of Plaintiff's ability to work or include a narrative discussion of how the evidence supported the ALJ's RFC conclusion. *Id.*

The Court finds that the ALJ performed a sufficient function-by-function assessment of Plaintiff's exertional and non-exertional abilities as well as sufficient narrative in support thereof.

─────────────────

or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Plaintiff is correct that SSR 96-8p requires the ALJ to first assess a claimant's "work-related abilities on a function-by-function basis" and instructs that "[o]nly after that may RFC be expressed in terms of exertional levels of work . . . ." SSR 96-8p, 1996 WL 374184 at *1.[4] However, SSR 96-8p also provides "[w]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id.*

The Court finds that the ALJ performed a sufficient function-by-function assessment of all functions for which the record included evidence of limitations. The ALJ's RFC, in full, stated:

> On the foregoing evidence, I conclude that at all times after January 2000, the claimant retained the functional capacity to perform a limited range of light physical exertion. He was able to lift and carry up to 20 pounds occasionally, lift and carry 10 pounds frequently, could stand or walk for two hours in an 8-hour day, and could sit for approximately six hours per day. ...There are no environmental restrictions and no restrictions in use of the fingers, hands, and arms or in gross or fine manipulation or bilateral manual dexterity (SSR 96-8).

A.R. at 18. The ALJ, in his opinion, incorporated the medical exhibits in the case (including multiple documents by Plaintiff's treating physician), Plaintiff's subjective complaints, and the testimony of the ME. A.R. at 16-19. The ALJ specifically noted his concurrence with Dr. Mohler's assessment that Plaintiff could not return to his prior occupation as an electrical

---

[4] SSR 96-8p specifically instructs the ALJ to consider the functions in paragraphs (b), (c), and (d) of 20 C.F.R. § 416.945, which include physical abilities (sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions including manipulative or postural functions), mental abilities (understanding, remembering, carrying out instructions, responding appropriately to supervision, coworkers, and work pressures in a work setting), and other abilities affected by impairments (including specifically, impairments of vision). 20 C.F.R. § 416.945.

substation foreman and, more relevantly, explained why he considered there to be "ample cause" to disagree with Dr. Mohler's conclusion that Plaintiff is totally disabled, as the medical evidence demonstrated that "Dr. Mohler's own medical records, those from the period of physical therapy, and those of the other examining and treating physicians show that after January 2000, the claimant was doing well, that he had recovered essentially a full range of motion and that he had returned to full weight bearing with the only manifestation of a knee disorder being a slight limp. . . . [I]n July 2000, the clamant had no difficulty going up and down stairs, was able to ride a bicycle, exercised frequently, and went for walks frequently." *Id.* at 19.   In accordance with *Butler*, the ALJ considered and resolved apparent incongruities and aptly noted that SSR 96-5p reserves the ultimate determination of whether an individual is disabled to the Commissioner. A.R. at 19.  *See Butler*, 353 F.3d at 1000, *see also* SSR 96-8p, 1996 WL 374184.

Plaintiff also specifically alleges that the record included testimony proffered by the ME that Plaintiff had environmental restrictions, needed a sit/stand option, and needed a cane for prolonged standing and walking, and that "none of these limitations were included in the residual functional capacity assessment, without explanation." *Id.* at 14.  Plaintiff's argument lacks merit. The ALJ very clearly incorporated a sit-stand option in his RFC.  *See infra* p. 19.  With respect to Plaintiff's need for "environmental restrictions," Plaintiff cites to page 285 of the administrative record, wherein the ME states that Plaintiff should avoid "extremes of heat and cold–10 below 0, that would be bad." A.R. at 285.  However, in light of the ME's statement that Plaintiff would have "no problem" in "any kind of interior setting," the Court does not find that the ALJ erred in not qualifying his statement that Plaintiff could only perform a limited range of light physical exertion *only* in above-freezing temperatures.  Finally, the ALJ incorporated evidence from Dr.

Mohler himself, provided after the hearing by request of the ALJ, that Plaintiff "did not need a cane to ambulate." A.R. at 18, 262.

The Court therefore finds that the ALJ properly considered the relevant evidence in arriving at his conclusion that Plaintiff retains the "residual functional capacity to perform work activities at a limited range of light physical exertion, including lifting up to 20 pounds occasionally, lifting 10 pounds frequently, sitting approximately 6 hours a day, and standing or walking for two hours a day." A.R. at 21. As a result, the Court cannot conclude that the ALJ's RFC assessment lacked substantial evidence.

###### E.      Evaluation of Plaintiff's Subjective Complaints

Finally, Plaintiff also argues that by allegedly requiring that he establish the existence and degree of his subjective complaints using objective evidence, the ALJ evaluated his subjective complaints improperly. Pl.'s Mem. for J. of Reversal at 15-16. Plaintiff is correct that the pain analysis is a two-step process. First, the claimant must show through "medical signs or laboratory findings" that he suffers an impairment "that could reasonably be expected to produce the alleged pain." *Butler*, 353 F.3d at 1004 (citing 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b)) (internal quotations omitted). "The objective evidence must confirm the existence of an impairment reasonably expected to produce the pain, in the amount and degree, alleged by the claimant." *Id.* (citations and internal quotation marks omitted). Only after this determination has been made can the ALJ proceed to the second step -- i.e., assessing the persistence and intensity of the pain, as well as the extent to which it impairs Plaintiff's ability to work, based on all available evidence, including the claimant's complaints. *Id.* (citing 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3)); *see also Craig v. Chater*, 76 F.3d 585, 594-96 (4th Cir. 1986).

Here, it is clear that the ALJ completed only the first step because Plaintiff was judged unable to show through objective evidence the existence of an impairment reasonably expected to produce the pain, in the amount and degree, alleged by him.  The ALJ discussed in great detail medical reports included in the administrative record that address Plaintiff's physical ailments, A.R. at 16-19, before expressly making his threshold finding that "[t]hese subjective allegations are inconsistent with the clinical findings reported by Dr. Mohler and all other attending, examining, and reviewing physicians[,]" ultimately concluding that Plaintiff's "subjective allegations are judged not fully credible."  A.R. at 19.  As such, and per the two-step process, the ALJ never proceeded to the second step to determine the persistence, intensity, and impact of the pain alleged by Plaintiff.  As "such credibility determinations are for the factfinder who hears the testimony," the Court will not disturb the ALJ's conclusion in this respect.  *Brown v. Bowen*, 794 F.2d at 706.

## IV.  CONCLUSION

Based on the foregoing review of the relevant law and the administrative record, the Court finds that the Administrative Law Judge applied the correct legal standards and relied on substantial evidence when he denied Plaintiff's claims for Disability Income Benefits.  The Court shall therefore DENY Plaintiff's [8] Motion for Judgment of Reversal and GRANT Defendant's [10] Motion for Judgment of Affirmance.  An Order accompanies this Memorandum Opinion.

Date:   February 19, 2007

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge

22